We'll hear argument next in Case No. 15-5040, Williams v. Pennsylvania. Mr. Lev. Mr. Chief Justice, and may it please the Court, due process does not allow a district attorney to make the decision to seek the death penalty against the defendant and then in the same case become a judge of the conduct of the prosecutor who carried out that decision and obtained that result. In this case, when he was district attorney, Chief Justice Castile made a discretionary individualized decision based upon a review of the facts that, in his view, death was the appropriate sentence to seek. Roberts, Does that make a difference, the nature of his decision? Let's say he had a policy. He said, I think every case in which a defendant is convicted of first degree murder, that we ought to seek the death penalty and leave it to the jury. Maybe the jury will agree or not, but I'm going to seek the death penalty in every case where there's a conviction of first degree murder. Would you have the same recusal problem? I think there would be, yes, because that policy itself would be a decision that he makes. Pennsylvania law gives the district attorney. No, no, I know that, but it's a categorical decision. In other words, he doesn't look at the particulars of that case. He has a policy that he's adopted, whether you think it's a good policy or not, that doesn't depend upon the particular facts, simply on the facts of what the conviction is. That would still raise due process concerns, because that policy would have led to a major decision within the adversary process. But what if the case was simply in the office, and he had supervisory responsibility over everything that occurs in the office, but it's a big office, if a question arose, somebody could bring it to him, but there isn't any indication of personal involvement, would that be enough? Supervisory authority might be enough, depending upon the issue. When the issue goes directly towards the conduct of the prosecutions in his office, it implicates the integrity of the office and the reputation of the leadership. So in that narrow circumstance the problem that is presented by this case is not where this constitutional line is going to be drawn. You want us to get into, get pretty deeply into the issue of a constitutional recusal policy for judges. So it's really not enough to just say what happened here was bad. Let's assume that that is the case. Assume for the sake of argument. I'm not saying one way or the other, but how far does this go? That's what I'm interested in. So supervisory authority would be enough, you said, but it depends on the issue. Why would it depend on the issue? Because the issue is directly related to that supervisory authority. Kennedy, what is the rule, then, that you're formulating so that we can answer Justice Alito's questions and similar questions? Recusal is required when, and fill in the blank. When the prosecutor has direct personal involvement in a substantial decision in the case and the issue before the court reflects upon that decision. I thought that your particular position was that a judge cannot sit on any case whereas the district attorney, he signed on to the death penalty. That would be, Your Honor, an appropriate decision, an appropriate due process rule for this Court to reach, but it's not a rule you need to reach in this case. Ginsburg Well, what short of that is, I thought, I thought the critical element is he was a district attorney, he signed off on the death penalty, some 20-odd years later he's a judge, he cannot sit on that case. I thought that was your position. Verrilli, Our case takes that, but also looks at the other circumstances of the case that includes the nature of the issue. Alito But that's the line-drawing problem. Why does it matter that it's the death penalty? What if it was not a capital case, but he signed the indictment? Verrilli, I think the death penalty only matters for Eighth Amendment purposes. If it was not a capital case, if he had direct personal participation in the case and faced an issue that was related to that level of participation, that involvement that he had, that would still be a due process. Alito But what if he signed the indictment? Verrilli, I'm sorry, I didn't. Alito He signed the indictment. Let's say the former, the then-prosecutor signed the indictment, and there are thousands of indictments in a county like Philadelphia, so that would be enough. Verrilli, No. The signing of the indictment would not be enough. But if his assistants came to him and said, we don't know if we have enough evidence to charge this person with this crime, what do you think? And he said, I've reviewed the facts and there's enough to charge, go ahead. That would be the direct personal involvement as opposed to the pro forma. Kagan You're saying that the signature would not be enough because that could be pro forma? Is that what you're saying? Verrilli, Yes. Roberts What if he had a situation where he was directly involved in a matter that had nothing to do with the issue that came up later? You know, he the assistant comes in and says, we've got a real question here. You know, he wants a third extension of the trial date, and should we oppose it or not? And he thinks about it and says, yes, let's oppose it. And then 29 years later, there's an issue about, you know, a Brady violation. Is he recused from sitting on that Brady violation case? Verrilli, If the decision he's made was only about some procedural matter that had no substantive relationship to the crime, then that would certainly be a much weaker court. And in the absence of any other circumstances. Roberts Can you give me a yes or no on my hypothesis? Verrilli, I would say no. In the absence of any other circumstances, that would not be a due process. Kennedy Well, under that answer, then, why doesn't the Brady violation problem drop out of the case? And that's not an argument for an extra argument for a recusal. Verrilli, Because I think in this case, the Brady violation goes directly to his role in making the decision. This is a Brady violation about sentencing, and it relates to the decision he made to seek the death penalty. And in addition, it goes to his essential role as the chief prosecutor. Kennedy Well, he didn't know about the Brady violation. The Brady violation basically occurred in the course of trial. Verrilli, I mean, after they sought the death penalty. Verrilli, That's correct. The record doesn't show that he had any personal knowledge of the Brady violation at the time. But a substantial Brady violation certainly calls into question the integrity of the office as a whole and not just the individual points of view. Kennedy Well, then that doesn't follow with the rule that you gave me at the outset. You should recuse yourself when, and now you're adding, if there's a question that involves a substantial integrity, a substantial question involving the integrity of the office, so that's an added factor in your analysis? Verrilli, No. I think that in my analysis, it's an issue that relates directly to the decision that's being made by the prosecutor, by their personal involvement. Kagan I guess I'm a little bit unclear as to what you're arguing. I mean, one rule could be, did the judge have some significant involvement in a critical trial decision as a lawyer? Is that your rule, or are you adding something to that rule? Verrilli, No. That would be, I think, a rule consistent with this Court's ruling in Murchison, that you can't have that a fair trial in a free society does not allow the prosecutor who prefers the charges to become the judge of that. But I don't think that's a rule you necessarily have to reach in this case. Caperton tells us to look at all of the circumstances of the case, and that's what I'm suggesting we do here. We look at all of the circumstances. Kennedy I still don't see how the Brady violation fits into the formula you want us to adopt, unless you're amending it to say anything that involves the integrity of the office while you were head of the office. Verrilli, I think more importantly, Justice Kennedy, that the Brady violation fits in because that is how the trial prosecutor carried out the decision that Chief Justice Castile had made. And so her conduct in carrying out that decision has a direct relationship to the issue itself. Ginsburg We don't have a Brady issue before us. The only issue is the recusal, right? Verrilli, That's correct. Ginsburg So we don't have the merits of the Brady issue are not in the case. But even the question that you're raising, you had prior opportunities to do that. You didn't raise it when there were prior post-conviction applications. So why aren't you precluding? Verrilli, That we didn't raise the recusal issue? Is that what you're asking me, Your Honor? Ginsburg Yes. Verrilli, In the prior post-conviction litigation, we didn't have the information that we had at this time, and that's the two critical pieces of evidence, of information here. One is the memorandum that authorized the death sentence that showed the kinds of factors District Attorney Castile looked at in making that decision and showed that it was he who made that decision. We didn't have that before. The second factor would be the fact that it was a Brady issue and that there had been evidence that had been suppressed and findings by a lower court judge that the prosecutor had done so willfully. So it was those two factors that were new to the case that caused us to file the recusal motion. Roberts There is a concern about sandbagging, though. I mean, if you do have a case where somebody has that information, I think the best thing to do would be to, you know, put it in the back drawer, take your chances on getting an acquittal, and if you don't, then you say, aha, the judge should have recused him or herself, and our remedy is we get to go back and do it all again. Sotomayor I recognize the Court's concern of sandbagging. It's similar to the concern the Court expressed in Strickland in ineffectiveness cases, that lawyers would try to create error so that they could give an open door, a back door to the defendant on appeal. I think that we've seen that judges across the States have been diligent in protecting against sandbagging. Roberts Well, Strickland is very different. I mean, you may think it's pretty unlikely that attorneys are going to deliberately commit error so that they have a later problem. But it's another thing if you're talking about a fact about the judge's prior involvement. Sotomayor I'm not sure I can agree with you, Your Honor, that it's unlikely I've had that argument raised many times during the course of my practice. But even if it's not against you. Roberts Not against me. But even if it is unlikely, I think sandbagging, for whatever concern, can be addressed by the lower courts and certainly isn't a reason to narrow or not apply a due process analysis. Roberts Well, I guess it's not a case of sandbagging, but it's somehow related in that the information you're talking about would have been information that seriously undermined the defense your client was presenting. In other words, the information goes to the nature of a prior relationship, and his whole argument defense was, I didn't know, you know, who this person was. I had no contact with him at all. So, you know, in what sense does that the material that you're complaining about now is the last thing he would want to have come out at his trial? Sotomayor In at least two different senses, I think. One is, as if this material were produced before trial. Before Mr. Williams testified, before he chose what defense he would present. Perhaps counsel who only met Mr. Williams the day before trial would have had the opportunity to talk to him about this evidence and counsel him and confer with him of what would be appropriate. My second part of the answer would be. Roberts Well, just so I understand, you're saying the evidence might have been sufficient to persuade him not to lie? Sotomayor Might have been sufficient for counsel to be able to develop the understanding with the defendant about what facts were important and what wasn't, and what might be a better defense than the defense this 19-year-old, this 19-year-old young man with little counseling hoped to present. But I would say even more is the materiality in this case goes to sentencing. And there are many examples of capital cases where an evidence, where a defense of not guilty was offered at trial. Sotomayor Counsel, am I correct that Mr. Draper, his accomplice, did not come forward until later, so he didn't know that the accomplice would say that there was a different story to tell at all, correct? Sotomayor That's correct. He did not know that prior. Sotomayor And he did not know that the sexual abuse could form a very potent defense to a death penalty, because there was independent proof of it. Sotomayor For sentencing purposes, yes. And I think the case is that there was no evidence of sexual abuse by this man of other people, correct? And in fact, the record showed there was. Sotomayor Correct. Roberts The independent evidence you're complaining about involved the defendant himself, correct? Sotomayor  The independent evidence of the defendant, well, let me step back. The testimony from Mark Draper related to the defendant himself. The documents that were found within the prosecutor's file related to conduct between the deceased and other young men. Alito What do you do with the fact that Chief Justice Castile was not solely responsible for the decision in this case? This was a decision by the Pennsylvania Supreme Court. Now, you say it was structural error. Suppose that the Court had been divided and Chief Justice Castile voted to affirm the decision of the lower court. Would that decision still be invalid on the ground that he shouldn't have been participating? Sotomayor It might be. There would still be a taint to the decision-making process. But perhaps in that one narrow instance where he voted in the defendant's favor anyway. But even there, we don't know. Alito But doesn't that mean it's not structural error? Sotomayor I don't think so, because even there we don't know what his role within the decision-making process. Perhaps it was a case where he already saw a majority, he had already persuaded a majority of the judges, justices to vote in his favor. And so to vote against it, then he thought his vote was a vote that he could make without injecting this issue. The problem is that he's not going to be able to do that. Alito So he might have persuaded a majority to vote to reverse, and then he turned around and he wrote an opinion saying that there should be an affirmance. Sotomayor The problem is we don't know what happened within the decision-making structure, and we can't know what happened within the decision-making structure. And that's why the rule should be that a defendant should be entitled, anyone should be entitled to a panel of appellate judges where there are no judges with bias. Alito If we agree with you, doesn't that lead inevitably to the rule that a majority of the judges on a multi-judge panel have the authority to require the recusal of a colleague? I don't think due process requires that there be any kind of review by some greater appellate judge. Alito Well, wouldn't they have to do the consequence? Suppose you make a recusal motion, you want Chief Justice Castile recused, and the other justices on the Pennsylvania Supreme Court say we think that he should be recused, and we're afraid that if we go ahead with this decision with his participation, the decision is going to be subject to attack down the road. And we can't allow that to happen, so we're going to require him to be recused in order to prevent him from tainting our decision-making process or creating at least the appearance that the decision-making process is tainted. So that would have to be a consequence of your rule, would it not? Sotomayor Not necessarily. The consequence is that they informally go to the justice. Alito And he says no. I disagree with you. Sotomayor If the rule in the State court, if the rule of the court is that the ultimate decision lies with the justice, then that's the rule, and they take the chances because that's the rule that the court's adopted, and that's a perfectly appropriate and fine rule. There's something else. Breyer What's awfully difficult in this case is not your case, for me. It's not your case. It's hundreds, or not hundreds, but look at all the briefs filed. There are disqualification rules all over the lot, and suddenly to turn this into a constitutional matter as we did in Caperton, which we did with our eyes open, we don't know what we're getting into. I mean, there are Congressmen who can become judges who voted on statutes. That come before them, as Justice Black did. There are executive branch officials who decide all kinds of things, and later on, something with their name signed on it comes up. When does the Constitution require it or not? So that's why I think you're getting these questions. My question is, is there a way of avoiding this? And the thing that is suggested by the other side is that you did ask for reconsideration. Reconsideration would have taken place without the Chief Justice because he had retired. Reconsideration can be pretty perfunctory, or it might be serious and thorough. Is there anything — is there a way for us to send this back and say, you said you reconsidered it, we're not certain what that reconsideration consists of? Reconsider it! I mean, is there a way to do that, and what do you think of that? That's what they're suggesting. There's a lot of questions that fit in there, so let me try to start. In my view, the Pennsylvania Supreme Court did not reconsider this case because they denied the motion for reconsideration. Had they granted the motion for reconsideration and then said, we'll take another look at this without Chief Justice Castile, that's the remedy that we have. Can we tell them to do that? Yes. Yes. That's the remedy that we're asking for. So we could say, given all the facts, of which there are quite a few, and the filing of a motion for reconsideration, and the fact that they may not have done it, go reconsider it, period, end of opinion. Can we do that? I would simply phrase it slightly differently. And say, what we're not asking for is to reconsider the decision that's already been made. What we're asking for is to go back into the position before the error was committed and hear the case fresh. Well, do they have to hear the case? Can we do that without holding that there was a constitutional violation? What would be our authority to require them to do it over again? It would have to be because there's a constitutional violation. Kagan. There's something unsatisfying about the remedy that you're requesting, right? Because if the idea is that one judge can affect a whole panel, which seems right to me, but presumably that effect doesn't go away the moment that we send it back and they have to deal with it again, so don't they continue to be tainted in some way? You faced that same issue in the Caperton case, in the Lavoie case, and granted the relief of sending it back for a new appeal. That may be there, and it may be that the remaining justices who heard the case, and the Pennsylvania Supreme Court is constituted differently should it go back. There were three new justices elected this last November and took office in January. So the remaining justices may have to consider whether or not they can put aside the prior proceedings and start from fresh or whether they're tainted. And we do that all the time. Whenever a case is reversed and sent back to a lower court judge or that judge has to make a decision to look at this case in light of the guidance they've gotten from the higher court, then I trust that the judges will be able to look at themselves and do that. Ginsburg. But there's one big difference between, I think, what Justice Breyer was suggesting and I think what you're asking. You wouldn't be satisfied if what the Pennsylvania Supreme Court was asked to do was simply to rule again on the matter of rehearing. You want a de novo appellate review, isn't that right? That's correct. What is the standard on rehearing? It must be a very different standard, isn't it? It's compelling circumstances. And the examples that are given in the commentary to the rule are things like a known and obvious mistake of fact or mistake of law. But it's a narrow remedy, rarely granted, of compelling circumstances. And that's not what we're asking for. We're asking for a fresh start. Roberts Counsel, I understand the first two of your three points, but I don't understand how the third works. This is, you're concerned that the Chief Justice cited his record with respect to capital cases in campaigning for office. That certainly wouldn't be a recusal issue without the other two points, right? That's correct. Okay. So how does that have anything to do with the argument in this case? Our concern for that is that, as a candidate, Chief Justice Castile was reported to have said on multiple occasions, I sent 45 people to death row. By saying that, he's taking the personal responsibility for those decisions and for those actions that I think reflect, become an additional circumstances that reflect upon the two other circumstances we've been discussing. So it's his decision-making and the break-up. It's an evidentiary point for you. It's not an independent ground for recusal. Absolutely. It's an added weight to the pile, but by itself it would not be a due process violation. What weight, if any, do you think we should give to the current moratorium in Pennsylvania on the death penalty? The moratorium is really not particularly relevant to the question that's before the Court. And not — weight should not be given to it. The moratorium is simply the Governor's action of delaying executions in Pennsylvania. And in Pennsylvania, the Governor has no power of commutation by himself. Without having a unanimous recommendation from a board of parole, he can't reduce sentencing. His only power is to grant reprieve in individual cases, and he's done that for Mr. Williams, to delay execution pending the receipt of a report from the legislature and possible action for it. In the — Alitos, the last time a prisoner was executed in Pennsylvania, other than those instances in which the prisoner decided that he did not want to pursue appellate remedies? The three executions in Pennsylvania since the passage of the new statute in 1978 were all — were all cases of prisoners who gave up their rights. I think the last contested execution was sometime in the early 1960s. So what's at issue here is only the death penalty, not the conviction itself, correct? That's right. And nobody has — nobody other than these so-called volunteers has been convicted since 1978, has been executed since 1978. That's right. But Mr. Williams remains on death row. He remains in solitary confinement and subject to the strict limitations of death row. If I may, Mr. Chief Justice, I'll reserve my time. Roberts. Thank you, counsel. Mr. Eisenberg. Mr. Chief Justice, and may it please the Court. Petitioner argues that it is Justice Castile's supposed direct and personal and substantial involvement with this case that creates the constitutional due process recusal obligation. But as he has said here today, such direct involvement in the case is actually not necessary to his argument at all. He has said that if the DA merely promulgated a policy in favor of the death penalty and opposing the death penalty in every case without any involvement in the individual case, that that would still be a violation of the Due Process Clause. And I think that very fundamental I think of our jurisprudence that says you can't be prosecutor and judge. And so I'm what does it mean to be a prosecutor if you're not taking responsibility personally, as he claimed during the election, for the decision to execute someone, whether by policy or by individual review? And there was clearly individual review here. At what point do we give meaning to the constitutional command that you can't be prosecutor and judge? I know there's so many different kinds of recusals. This is the ideal case for someone to make a due process claim because the judge here actually signed his name to his review of the facts and his decision to seek the death penalty. But, I mean, as I'm looking at most of the ethical codes, most of the ethical codes would have said, you get off, you made this decision. Your Honor, I think that's exactly the point, that the ethical codes or statutes that really control for this sort of situation and that as a constitutional question, this is not the ideal case at all. Because in this Court's Caperton decision, you made it very clear that it was a totality of the circumstances test that looked at the intolerable probability of actual bias in the case. No bright lines, no automatic, no presumptions. You have to look at the actual – the probability of actual bias in the case. And if Justice Kessler deals with this case, I think that the public would find it unusual that someone who makes a decision as to whether to seek death penalty or not, that the public wouldn't perceive that as a great probability of actual bias? Now, I don't want to talk about, I don't at the moment, the history, that there are some cases he disagreed with. But don't you think as a reasonable probability that that appearance of impropriety is just present? I think, Your Honor, that after 30 years, maybe everybody wouldn't see it that way, especially if they looked at the rest of his record, as you have referred to. And I think that the major point, Your Honor, is that any sort of prior conduct by a judge in his prior life that gives rise to an intolerable probability of actual bias is the test. It's not limited in some way to prosecutors or even to people who previously had some brief involvement as counsel in a case. So as the Court has said, one looks at the psychological tendencies of human beings. That's what the Court addressed in Caperton. And we know that there are many cases, as Justice Breyer has referred to, where judges or justices have been far more involved in an issue that came before the Court once they became a judge or justice later on than Justice Kestel was in this case. There are many instances where judges or justices worked on an issue, spearheaded an issue, fought for legislation, for example, for years and years and years, even if they may have had it named after them, and then sat in judgment on the constitutionality or scope of that legislation. Now, I think that the public would see at least as much potential for bias in a situation like that, at least as much possibility that the — that, given human psychology, a justice in that position would be reluctant to overturn his or her own statute. The reason that that's not a constitutional violation is because I think that Caperton and this Court's law generally recognize that judges are human beings, they have prior lives, and that we don't want to have a situation where the only people who can become judges and sit on cases are people with no prior experiences. Kennedy, the number of amicus briefs filed by former prosecutors and attorneys belies and refutes that suggestion, it seems to me. And section 455 of 28 U.S.C., where we have rather mechanical recusal standards, also refutes that. Your Honor, my point is not that there can be no bright lines adopted as a matter of code or statute. Obviously, there can be. And the Court in Caperton was very clear, to make clear in an extended discussion, that the due process test is merely a constitutional floor and that the ceiling is set by those codes and statutes. That's where you can draw those sort of bright-line tests, Your Honor. And in fact, as follow-up to Caperton's case. Kennedy, but you were arguing, well, this is going to be unworkable. And we know, both from the briefs and the statutes, that far more rigid recusal standards are in place and are quite workable. Well, they're workable, Your Honor, but it's very different to constitutionalize, in essence, to raise the constitutional floor to the ceiling. And that's essentially what the Defendant is asking for, the Petitioner is asking for here, but in a way that is not really internally consistent. Roberts, what would be your standard? I mean, I assume you would agree that in certain circumstances a failure to recuse would raise a constitutional problem. So how would you articulate the appropriate test? I think the degree of the prior involvement and the, among other factors, the timing, the recency of the prior involvement, have to meet the Caperton standard of an intolerable likelihood of actual bias in the case. And if the — in a case like this, where the district attorney presides over a large office, has many, many cases. During his tenure, there were over 2,000 murders in the city of Philadelphia. A great number of them were death-eligible. Even if 20 percent were death-eligible, that's 400 cases. He's not likely to remember the details of any particular case. Well, but here, of course, the essence of the Brady violation, as alleged, is that the evidence was concealed for years. They didn't know about it. And he didn't know about it either, Your Honor. As has been observed, there's absolutely no allegation that Justice Castile had anything to do with the violation. So to him, it was.  He didn't know about it because subordinates in his office, under his supervision, concealed the facts. That's — that was the allegation, Your Honor. And the assumption that the Petitioner wants the Court to adopt as a matter of law is that then looking at the case 30 years later, he would be trying to protect himself by hiding that, rather than perhaps angry at the people who had done something wrong. There's no basis in the law. Kagan Mr. Eiser, if I could express my — I'm sorry. If I understood your answer to the Chief Justice, you said significant involvement in a critical trial decision would be a critical factor in deciding when a person had crossed the constitutional line. You then simply said that there's kind of a statute of limitations on it, and because this is 30 years ago, that makes a difference. Am I understanding you correctly? Eiser I don't recall that I said significant involvement in a significant trial decision, Your Honor. Certainly significant involvement in the trial, in whatever that may be. And while the death penalty decision is true … Kagan I'm not sure I understood the difference there. You mean you have to be in trial in the courtroom as opposed to in the office, making critical strategy decisions about how to prosecute a case? Eiser No, Your Honor. But the former actually trying the case is obviously much more significant involvement. I'm simply saying that it's … Kagan Well, just — I mean, just go back to what the test is. So it's significant involvement in what, at what time? Eiser Significant involvement in any matter, in any case or cause that would be likely over that period of time to create a — an intolerable probability of actual bias in deciding the issue in that case. Kagan And what time is the critical time? Is it 6 months, 5 years, 10 years? Eiser There is no bright line there, Your Honor, any more than there was in Caperton. In Caperton, you had a judge who received $3 million in campaign funds during the time that the case that he was going to decide was pending and about to reach his court. Had he received $3,000 or $30,000, and had he received it from the same man but 10 or 20 or 30 years earlier, it would have been a different case. And the Caperton decision in and of itself doesn't tell us the answer to all of those other hypotheticals. But it is clear that those factors matter. And as they change, the likelihood of an intolerable probability of actual bias is reduced. Kagan But as I understand you, the one factor that seems to be controlling here is the time limit. And other than that, there's — everything points to due process demanding a recusal except for the time limit. Eiser It is, as always, a balancing of factors, Your Honor. If he had tried the case, if he had spent a year, as the trial prosecutor in this case did, actually trying the case, going in on the first murder, going in on the second murder, 30 years isn't going to matter that much in this — in that situation. Kagan He made the most important decision that could be made in this case. Eiser He concurred in the recommendation to do that, Your Honor. Kagan I'm sorry, is there a difference between those two things? Eiser Well, there's something of a difference in terms of the implication about the level of his involvement. And the reason that that's important, Your Honor, is because the question is, what's he going to be remembering and thinking about and feeling personally committed to when he comes to this case 30 years later as a judge? That's how you assess the likelihood of actual probability — of actual bias. And if, in fact, he spent the time it takes to read a one-and-a-half-page memo 30 years ago in a city where there were 2,000 cases of murder and hundreds of other death penalty cases where he was reading similar murder cases. Kagan Do you think he didn't take that decision extremely seriously? Eiser I think he took it seriously, Your Honor, but I think that he took it less seriously than if he had been — or it involved less reflection on his part than if he had been making it for himself in the first instance. Sotomayor Did all 2,000 murders — did all 2,000 cases get the death penalty treatment? Eiser No, Your Honor, but a significant percentage of them did. Sotomayor Were there cases where he said no to some death penalties? Eiser No, Your Honor, not to death. Sotomayor Were there policies he's established to establish when death penalty was appropriate? Eiser There was no sort of written policy, Your Honor. These were — Sotomayor That's an interesting use of words. Eiser I — well, I am not aware of any. Sotomayor Somehow someone had to make a decision of where to cut the line. Eiser They looked at each case on its merits. They looked at the aggravating circumstances under the statute, and they decided what— Sotomayor I presume they looked at mitigators, too. Eiser Well, they may or may not have, Your Honor. At the time, there was — there would have been three— Sotomayor Well, the memo required them to talk about some mitigators. Eiser That's not actually true, Your Honor. Sotomayor Well, this memo— Eiser This memo did spend a brief portion of time. In the 500 words of this memo, 450 of them addressed the facts of the crime relating to aggravating circumstances, and there were about 50 relating to mitigation, Your Honor. Now, we don't know what Justice Castile thought was significant about the memo. When he read the memo, he was not required to underline this part or that part and say this part is important or not. We only know what he has said in prior cases where recusal was sought, which was that he treated all of these cases the same way. He had the same policy and procedure for all of these. Sotomayor Suppose this case were exactly the same, except he had done it three years ago. What would your answer be to that? Eiser I think that would be a much closer question, Your Honor. Sotomayor What would your answer be? Eiser I'm not sure, Your Honor. Roberts So the fact that he's been 30 years in solitary confinement actually helps the State. Eiser Well, Your Honor, as we addressed in our brief, it's not exactly 30 years in solitary confinement, and the governor who issued the moratorium is in charge of the Department of Corrections, and if he wants to change conditions on death row, he's certainly free to do so. I don't know if there's been any request by this defendant or others to rearrange things in light of his moratorium. Alito We are talking about a constitutional recusal rule which would have very serious consequences. So if it's – even if it isn't absolutely necessary that that rule be very clear, certainly it is highly desirable that it be very clear, so that everybody can determine with a degree of certainty when the time – when the decision is made whether recusal is constitutionally required or not. And I really don't see a clear rule that would encompass this situation other than a rule that said that a judge may – is required by the Constitution to recuse in any case in which the judge had personal participation as a prosecutor. Anything other than that seems to me to be pretty fuzzy, but that would be a pretty far-reaching rule. So can you think of one that is – that is not as far-reaching as that, but nevertheless is clear? If we talk about the number of years that passed or how significant the – how significant the issue was or things of that nature, those are all going to be subject to a lot of uncertainty and debate. They are, Your Honor, but that's exactly the situation in Caperton that this Court addressed and ruled on. There were no such bright lines that arose out of Caperton, even on a matter that is of great importance, which is the nature of campaign contributions. What did happen after Caperton, though, Your Honor, is that some – there was a model rule, 4.4, adopted in which a bright line was drawn. Any amount over X, $3,000, $4,000, is a violation of these rules. Any amount under it is not. A dollar more is a violation. A dollar less is not. That's a clear rule, Your Honor. But it was done by a rule, not by a constitutional mandate. And it will be up to each individual jurisdiction what number they plug in there, what campaign amount, that contribution amount they think is the appropriate amount. Now, there's also a rule, 2.11, and that is somewhat akin to the Federal Statute 455 involving prior involvement by a government lawyer in a case. And that really is the argument that the Petitioner has been making. He calls it a constitutional Caperton argument, Your Honor, but he uses the exact language of Rule 2.11. And that's – that would certainly be making the constitutional floor into the statutory ceiling. There would be no room in between. But I would like to speak for a bit about the second question in the case, Your Honor, because I think it's actually even more troubling than the first one, and I think it would be a radical departure from previously – from previous practice. The Petitioner's position is that because we can't know exactly what the other judges on the panel do, we have to throw out the whole case. We have to assume, in essence, the worst. We have to assume as a constitutional mandate that all the other justices or judges were tainted. And that's a reversal of the essential premise of judicial review, which is that at least non-recusable judges follow their oaths to apply the law. And if we do abandon that principle, we have not just theoretical but very practical problems. Kennedy, so I suppose for purposes of phrasing the question, to reach question 2, we will assume that there is bias, we assume he should have recused, but then is it your submission that there is harmless error because there was a multi-member panel? I wouldn't call it. Is that a fair statement or not? I wouldn't actually – I don't think that the phrase harmless error is the best way to describe the situation, Your Honor, because with a multi-member court, the process is the court, not an individual judge. At the trial level, the judge is literally the court. So if the judge is constitutionally biased, there is no issue there. But it's a very different issue at the appellate level. Roberts So I just – so I understand the scope of your argument. You would be arguing the same thing if there were three judges? One should have recused, that leaves two? What I would be arguing, Your Honor, is that, again, a totality of the circumstances test applies. Certainly, the vote matters, okay? If it's 3 to nothing, that's better than 2 to 1. If it's 6 to nothing, that's better than 4 to 2. The vote is often going to be highly dispositive. Roberts Well, that could be the whole point. I'm sorry, Your Honor. Roberts The main circumstances would seem to me to be, as a real fact matter, is what the deliberations of the judges were like. I mean, if the individual who should have been recused occupied a dominant role in the discussion and was successful in persuading colleagues and all that, and of course that's the sort of evidence you certainly can't have access to. Kneedler Your Honor, of course an individual justice can be persuasive to other judges or justices. On occasion, perhaps even a lawyer can be persuasive. But if so, it's by the power of their reasoning. And if they are – if other justices are persuaded by something other than the power of the argument, then they are not fulfilling their oaths. If they are persuaded because they like the person or if they vote against because they don't like the person. Kennedy Suppose you have a very brilliant trial judge and the power of his reasoning is persuasive and forceful, but he's biased, end of case. You have – he has to be recused. Kneedler Yes, Your Honor. But the difference here is that the other justices on the case don't have to be recused. And the pressure on the other justices on the case is that they have to be recused. Breyer Well, this is common in the situation where someone is appointed to this Court. There are a series of cases where he has sat, that judge, and very often they are decided by the two people who remain. They don't re-hear the whole case. Kneedler  And I think that's true. Breyer In that case, there was nothing wrong with the participation at the time. Kneedler But, Your Honor, I think that's true. Breyer A harder point is the judge from Guam, I think, who wasn't supposed to sit in the Ninth Circuit. And again, I think we – the decisions went ahead. The same thing could come up with recess appointments. And there are many of those. And – but I don't know where there's a disqualification of the judge because of bias. Now, in that kind of situation, is there any precedent that supports you? Or maybe the other way. Kneedler Your Honor, I think that there are many cases where, after disqualification, the remainder of the panel goes on to decide the case. Breyer  Because in that circumstance, there's something biased about that judge being in that panel. Now, in that situation, I can think of a lot of others that I've just mentioned. But in that situation, are there instances – how does it cut? What does the ABA say about that one? And what have you found? Kneedler I think it's addressed by Advisory Opinion No. 71 in the guide for the counsel from the – I believe from the judicial conference. I'm not sure exactly the authority, but it's an advisory opinion for Federal judges. And it says that where a judge recuses during the process, the remaining judges can carry on. And I think that these recusals will often occur under under Section 455, Your Honor, which, as this Court has described it, covers both actual bias and the possibility of actual bias. And there's no such distinctions made in the advisory rule. And many of the cases cited by either Petitioner or ourselves have actually relied on Advisory Opinion No. 71. Now, under Petitioner's position, that's impossible, because the recused judge has already participated in the process. It doesn't matter if he gets out before the vote in Federal court. Breyer No, no, but there's a difference, you see, where the judge recuses himself during the process, the remaining judges know that. And because they know that, they make an effort to decide it among the two, where the judge didn't recuse himself during the process. The other judges take his point of view into account just as they would if they're in any ordinary circumstance. Now, in practice, I think that's a big difference. Breyer Your Honor, they always take the other judge's opinion. Breyer Not in an instance where you know that you shouldn't, because that judge should not have participated. Breyer But under Petitioner's point of view, Your Honor, we can't know that. His whole argument. Breyer You can't know it at the moment, but what you do know at the moment is that the two judges think we must ignore his situation, what he thinks. They didn't think that, so, of course, they didn't. In the situation that they're talking about in the ABA, I take it the remaining judges do know that they are not to take into account the opinion of the judge who's out of it. Breyer But they can't know whether they were biased by it, Your Honor. That is the Petitioner's position, is that we cannot rely on the judge's opinion and the other judges to know what may have biased them from whether they were biased by the participation of someone. Alito In this case, did the other justices of the Pennsylvania Supreme Court know about the recusal motion at the time of the decision? Breyer The recusal motion was docketed, Your Honor, and so they undoubtedly knew about it, and they also knew that prior motions had been filed. And, in fact, in prior cases, as we've pointed out, the Petitioner actually essentially appealed from the individual decision of Justice Castile not to recuse and asked the rest of the court to keep it. Sotomayor But in the other cases in which that was the case, no one knew that he was actually signing off on a review of the cases. Breyer They knew that the allegation was that he was personally approving them, Your Honor. That has been known all along. Prior recusal motions were based on that assertion that he was personally recusing them. Now, there's any number of ways in which he could have done that. He could have held a conclave. He could have had a week-long meeting to decide every individual case. He didn't do that. What he actually did was much less involvement than that sort of process would have entailed. So the fact that they didn't have the memo didn't change the essential point of the argument. And, in fact, Petitioner has said here today that even if the district attorney had a flat policy and didn't look at any individual cases, that would still be a recusal problem. And I think that the participation or the involvement of other justices is really one of the core problems here, because under the Petitioner's point of view, it really can't happen, because they will be tainted by the justice who they are looking at. They are collegial. It's a collegial process, he says, and because of that, they can't really know what they're – whether they've been affected by what he did. And so we really have a dead end or a circularity here, Your Honor, because there's nowhere to go. And if you look to pick up on earlier questions, if you look at this Court's historic practice, as it's termed it, in recusal matters, it is to refer a recusal motion to an individual justice, and that's it. Now, under Petitioner's approach, I think that's seriously problematic, a difficulty for the Court. You have two options, either to continue that practice, having held, if you adopt Petitioner's point of view, that the failure to recuse, the erroneous failure to recuse, taints the votes of every other justice on the Court, but the Court declines to look at the issue, or you adopt a new practice in which the Court, in fact, looks at the recusal of the individual recusal and makes a decision for itself, which will be on any particular case. Sotomayor, I'm a little confused by this, and this line of argument. What is Pennsylvania? Each individual judge decides whether to recuse. Actually, in Pennsylvania, Your Honor, there was the opportunity for full court review, and Petitioner just didn't avail himself of it in this case. He did in the prior case, so we know the procedure. I thought we were told that he had to go through the judge who wants to recuse. He cannot make a motion directly to the panel. He has to say, judge, you should recuse, and I want you to refer the question. That is a misstatement of the internal operating procedures, Your Honor. The Court held in the Goodhart case that is cited in Petitioner's brief that while the decision was in the first instance for the individual judge, justice, the full court would look at the matter and, if necessary, would tell that justice that he had to recuse. And, in fact, the Court followed the practice of looking at it in the previous case. Ginsburg. And one thing is to look at it, what triggers the look? That is, is a defendant permitted to say, I want the judges who did not participate to make this decision? Yes, Your Honor, and counsel did so in a prior case only several years ago. They filed a motion for reconsideration. Justice Kestel recused himself from that motion, and the full court went on to decide it. Under the IOPs, motions for reconsideration go to the individual justice, not to the chief justice. So if Petitioner's theory were correct, Justice Kestel could have blocked that reconsideration. He did not. He recused himself and passed it on to the rest of the Court. When under the IOPs a matter is assigned to an individual justice on the Pennsylvania Supreme Court, a full court matter is assigned to an individual justice, section 2 of the IOPs state explicitly that the assignment neither enhances the power of the That's really wonderful, and how about if they got it wrong? Meaning, it doesn't mean that if a whole court looks at something, it's gotten right. If there's an ethical standard that says that a judge who's been involved in a case shouldn't be there, then they got it wrong on their own rules. If there's a constitutional standard, it doesn't mean they were right either. They got it wrong if they let him sit. Yes, Your Honor, but they still face a dilemma, because they have to make a decision about whether the Constitution. Sotomayor, but they have to do it no matter what, meaning if the State is telling them, look at this and recuse someone if it's appropriate to do so, then the State has imposed that obligation on them. Well, the question is whether the Constitution imposes the obligation for the full court to look at it. And, in fact, in his recusal Well, nothing about a decision in this case would require that. That's a feature unique to Pennsylvania. In many other States, including this Court, it goes up to the individual judge. In his recusal motion, Your Honor, at page 200 in the Joint Appendix, I'm sorry, at page 202 in the Joint Appendix, you'll see that Petitioner made exactly this argument. He said, indeed, due process requires, emphasis in the original, requires that the full court decide due process-based recusal claims. And I think on Petitioner's theory, that would be true, because it's a constitutional issue and the failure to decide it potentially taints the rest of the court, so that the action of the entire court is automatically invalid. And that's, I think, not what due process requires, because at the appellate level, the process is not the individual judge, it's the court. And the recusal or nonrecusal of an individual judge does not, in and of itself, automatically result in a deprivation of due process, because he is not the process. The court is the process. And you look at a variety of circumstances to decide whether the other members of the court, on an objective standard, you can't know what they are doing subjectively, of course, but on the same objective standard is applied in Caperton to determine whether there is a probability of actual bias on the part of the other members of the court, whether it's a court of three or a court, as some en banc courts can be, a court of 15. Under the Petitioner's view, even the 15-to-nothing vote would be automatically constitutionally invalid. And we don't think that that's a good thing. Kennedy, but if we say that, then we say that being a judge on a 15-judge court doesn't really make much difference. You don't have a duty, you don't have an obligation, you can't persuade your colleagues. It's very hard for us to write that kind of decision. May I, Your Honor? Your Honor, I think the answer is what the Pennsylvania Supreme Court states in its section 2 of its IOPs. On every court of every size, it is the duty of each individual justice to make an independent determination, following his oath, to do the right thing. And that is why the court is not automatically invalid. Thank you. Thank you, counsel. Mr. Lev, four minutes remaining. Thank you. Let's start with the passage of time. In our view, the passage of time isn't the relevant factor. It's that it's the same case. This is, even though this case has lasted a very, very long time, through numerous different hearings and delays, this is the same case. And so what you had was Chief Justice Steele participating in this case as both a prosecutor and a judge in the same case. And that's where the problem, that's where the due process problem starts. What separates this out from the ethical rules is that this is an extreme and rare case. That's what Paperton was talking about, where the ethical rules were not sufficient to cover the problems here. And we know that this is an extreme and rare case because there's no other case like it, right? There's no other case that Respondents have cited to and none that we found where a judge in this situation has sat and decided on the case. Alitoso, this may be an extreme case, but if we do not say any personal participation requires recusal under the Constitution, what other clear line can you give us? Well, to the extent that Paperton is not a clear line, I think we're still with Paperton. If you want to clarify the line of Paperton, it is about the judge's participation in a significant decision-making in the case and where the issues before them are related to that decision-making. That's the line I would suggest that you can draw in this case. On question 2, if you accept the Respondent's position, what you would be saying is it's okay to have one biased judge on an appellate panel, or two, or three, so long as a majority voted in favor were not biased. And that's not appropriate under the Due Process Clause. The idea of fairness, the public confidence in the integrity of the fairness of the system requires that each judge be free from bias. And lastly, I would say about referring to the full court, we did that. We asked, if you look at our motion to recuse that's in the Joint Appendix, I think it's section 4 of our motion, says if Justice Castile denies this, we ask that the full court hear it. And Justice Castile, using his power as the Chief Justice, blocked that. He said, I'm going to deny the motion to recuse and I'm going to deny referral to the full court. So we did what we could to have the full court hear it, and we weren't able to get that.  Roberts.